UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

**UNITED STATES OF AMERICA**         **PLAINTIFF**

v.                                    No. 3:13-cv-1102-BJB

**LARRY H. JOEL ET AL.**              **DEFENDANTS**

\* \* \* \* \*

## OPINION & ORDER GRANTING SUMMARY JUDGMENT

Larry Joel is an eye doctor who, for decades, has been delinquent on his taxes. For the last 12 years, the United States has been attempting to adjudicate all potential interests in Joel's house, seize and sell it, and use the proceeds to pay off some of those back taxes. All the while, Joel and others connected to Joel have vigorously resisted those attempts. Now, however, the end is in sight: the United States has moved (yet again) for summary judgment against the final two defendants—"WWWM, LLC" and Joel himself. The questions at this stage are limited: is WWWM a separate legal entity with its own legitimate interest in the proceeds of Joel's tax debts, or merely an alter ego holding the interest for Joel himself? And does Joel have any remaining argument against enforcement of the tax lien against his house? Based on the record before the Court, neither question is sufficiently disputed to require a jury determination: Joel and WWWM are, for tax purposes, one and the same, and because federal law authorizes the United States to seize Joel's house and sell it, the Court grants both motions.

### I. Procedural History

Larry Joel was a successful optometrist. But he didn't pay his taxes. So in 2007, the United States charged Joel with—and he pled guilty to—criminal violations of the tax code. *See* Plea Agreement (DN 192-8) at 1. Joel admitted that he underreported his taxable income and "used two trusts" to "improperly hold a number of assets"—including luxury cars and a 72' yacht—from IRS scrutiny. *Id.* at 2–3.

Joel nevertheless failed to pay the United States his back taxes during the following six years. So in 2013, the United States filed this civil suit to collect the tax debt using the value of the expensive house Joel lived in. The Government sought to foreclose on Joel's house on Champion Lakes Drive in Louisville, sell the property, and use the proceeds to pay off a portion of Joel's tax debts. *See* Complaint (DN 1).

This case has plodded along since then. Five different judges have presided, dozens of attorneys have appeared and withdrawn, several hearings have occurred, and multiple opinions have issued. Those proceedings (*see, e.g.*, DNs 78, 123, 179, 205) set forth this case's tortured procedural history, which is unnecessary to recount in full here.

Briefly, Joel and his enablers used several corporate entities to distance Joel himself from the property. The strategy was simple, even if the tactics were complex: transfer ownership interests to as many different entities and individuals as possible so that a potential foreclosure would leave the Government holding a junior interest that recovered little or nothing. This involved the use of a sham trust, efforts to enlist an "indispensable party," the creation and funding of a limited-liability corporation, financial transfers between legal entities connected to Joel, and acquisition of state "certificates of delinquency" that purportedly gave one of these entities rights in foreclosure proceeds superior to the Federal Government's.

For a dozen years, the Justice Department's Tax Division has litigated to extinguish these competing legal interests. This step is required under the Tax Code before the United States may foreclose on a delinquent taxpayer's property: the court must "finally determine the merits of all claims to and liens upon the property" before ordering a sale. *See* 26 U.S.C. § 7403(c). The United States originally sued seven such entities as potential claimants or lienholders as Defendants in this case. Amended Complaint (DN 79) ¶¶ 4, 6. Several didn't bother to assert any interest: this Court has granted default judgment against American Tax Funding, LLC; Capital One Bank (USA), N.A.; the Commonwealth of Kentucky; and Tax Ease Lien Investments 1, LLC. *See* DNs 166, 203. And the Court granted summary judgment against one Defendant that did object—L. Gregory Yopp as trustee of C.T.J. Trust—because the record showed that the trust held Joel's property in constructive trust for Joel. *See* MSJ Hearing Transcript (DN 179) at 18:10-13; Order Denying Reconsideration (DN 204).

Now, only two Defendants claiming an interest in the property remain: WWWM, LLC, and Joel himself. The United States has moved for summary judgment against both. DNs 192, 193. According to the United States, the undisputed record demonstrates that WWWM doesn't have a valid claim to the house that would stand in the way of a court-ordered sale: the LLC either holds its interest in the Champion Lakes property in constructive trust for Joel or, alternatively, is Joel's alter ego.[1] *See* MSJ Against WWWM (DN 192-1) at 6–13. And as to Joel

---

[1] This claim, to be clear, concerns the distribution of foreclosure proceeds rather than authorization for the foreclosure sale in the first place—which might strike some as out of

2

himself, the United States argues that once WWWM's claim is out of the picture, § 7403 entitles the government to a judgment authorizing foreclosure on the Champion Lakes property, with the proceeds going toward Joel's federal tax debt. *See id.* at 14–15; MSJ Against Joel (DN 193-1) at 4–8.

For their part, neither WWWM nor Joel has seriously contested either the Government's motions or the considerable record evidence marshaled in support. They've instead chosen to recycle now-irrelevant factual arguments and relitigate legal issues the Court has already decided. And they've done so only grudgingly—in late submissions offered after repeated prompting by the Court. *E.g.*, DNs 196, 199, 204, 210. Despite every reasonable effort to elicit the Defendants' positions on the merits, those contributions add up to very little indeed. So on this record, the Government has carried its burden of proof and demonstrated entitlement to summary judgment under Rule 56.

## II. Summary Judgment Against WWWM, LLC

The United States first seeks summary judgment against WWWM, LLC. That entity claims an interest in Joel's unpaid state tax debts—an interest senior to the United States' federal tax debts. According to the Government, WWWM is nothing more than Joel's alter ego. So, on the Government's theory, when proceeds of a prospective judicial sale are distributed to Joel's creditors, and WWWM gets paid first, it's really *Joel* that's getting paid from proceeds meant to satisfy *his own* tax debts. *See* MSJ Against WWWM at 13. Because the law forbids such self-dealing, the Government asks the Court to extinguish WWWM's interest in the proceeds from any future judicial sale. *See id.* at 14–15.

### A. WWWM, LLC

WWWM, LLC is a Kentucky-registered limited-liability corporation claiming an interest in the Champion Lakes property. It has nine members: Thomas Freedman, Larry Joel, Cody T. Joel, Apryl Robinson, Michael Ching Chao Chang, Felicia Chang, iDOC Shanghai, AP Partners, and OM Partners. DN 208-9. Those members, however, don't vote or hold meetings; only Joel himself has signature authority. WWWM Deposition (DN 192-2) at 33:22–25. WWWM has never paid a dividend, issued stock, or turned a profit. *Id.* at 48:21–25. It doesn't engage in meaningful financial transactions. It has no officers, directors, or employees. *Id.* at 40:24–41:2. And the records it has on file with the Commonwealth are incorrect,

---

order. But the statute plainly calls for courts to adjudicate the rights of potential claimants and lienholders before ordering a sale. So the Court addresses WWWM's purported interest in any proceeds before considering whether the Government may proceed with the sale.

3

listing only one member instead of the actual nine. *Compare, e.g.*, DN 119 at 31 (2017 tax form listing all nine members), *with* DN 192-7 at 6 (2017 state record listing only Thomas Freedman as a member).

Although the origin and purpose of WWWM are disputed (more on that below), the record is crystal clear that it does very little. As WWWM's corporate representative testified, his only responsibilities pertaining to the LLC are to 1) make sure the corporate bank account has "a few bucks in there to pay the monthly fee" and 2) ensure the LLC pays its taxes. WWWM Depo. at 19:18–20. Because WWWM has "so little activity," a CPA can do its taxes on "an Excel spreadsheet" instead of more complex software. *Id.* at 32:11–14. iDOC—a separate business founded and "ru[n]" by Joel and for which Joel makes the "strategic decisions"—pays the annual filing fee. *Id.* at 55:24–56:5.

WWWM's interest in the Champion Lakes property is in the form of "certificates of delinquency." Ordinarily, when a citizen is delinquent on his state property taxes, he owes those taxes to the Commonwealth. The Commonwealth, however, may sell its interest in those unpaid taxes—known as "certificates of delinquency"—to private third parties. Those third parties are then entitled to the balance owed, plus interest, whenever the delinquent property owner pays up. *See generally* K.R.S. § 134.128. In the event of foreclosure, certificates of delinquency take precedence over other unpaid state taxes and even unpaid federal taxes. K.R.S. § 134.420(3); 26 U.S.C. § 6323(b)(6)(A).

As discussed above, Joel remained delinquent on his taxes for the Champion Lakes property for many years. So the Commonwealth generated certificates of delinquency to sell. *See generally Brown v. Tax Ease Lien Servicing*, No. 3:15-cv-208, 2018 WL 1573231, at *6 (W.D. Ky. Mar. 30, 2018) (describing process by which Kentucky sells senior interests in tax receivables). WWWM bought the certificates of delinquency connected to Joel's debts in July 2015. Assignments of Certificates (DN 119) at 13–30. At that time, their value appears to have been roughly $110,000. *Id.* But as of 2019, their value exceeded $350,000. *Id.* at 32. And, according to one (apparently unrebutted) filing in the record, they have been accruing interest at a rate of over $115 per day. *Id.* So by now, the certificates make up a substantial portion of Joel's debt.

Remarkably, the certificate purchase is one of only a couple WWWM transactions of any significance noted anywhere in the record. The only other transaction of any note reveals where WWWM got the infusion of cash to buy the certificates: iDOC—a company founded by Joel and whose board Joel chairs—transferred $300,000 to WWWM just before the certificate purchase. WWWM Depo. at 37:5–23 ($300,000 check from iDOC to WWWM dated June 2015). Shortly

4

thereafter, WWWM purchased iDOC for $1,000—a small sum in light of the "forty years and millions of dollars" iDOC spent developing its own business. Weaver Affidavit (DN 208-6) ¶ 4; *see also* Stock Transfer (DN 208-10). And the purchase occurred only *after* the Jefferson Circuit Court ordered the sale of the Champion Lakes Property to satisfy Joel's unpaid debts. Motion to Add Party (DN 42-1) at 2. The record contains no explanation for these odd and sequential transactions among entities connected to Joel—other than Joel's interest in using funds to *acquire* rather than pay off his own tax obligations.

As matters currently stand, then, should the United States foreclose on the Champion Lakes Property, WWWM would be first in line to be paid from the proceeds. And that, the United States argues, is the problem. According to the United States' summary-judgment motion, WWWM's interest and Joel's interest are legally inseparable. That's either because WWWM holds the certificates in constructive trust for Joel himself or because WWWM is Joel's alter ego. Joel, in effect, is standing in line ahead of the United States to collect on his own debts.

### B. Summary Judgment

Summary judgment is appropriate under Federal Rule 56(c) if no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law. The United States advances two theories—constructive trust and alter ego—in support of its motion. The Court needs to reach only the second.

An alter-ego claim "asserts that the two parties should be treated as the same party." *Church Joint Venture, L.P. v. Blasingame*, 947 F.3d 925, 930 (6th Cir. 2020). "Under Kentucky law, to show that a corporate entity is the alter ego of another, [a party] must prove both: '(1) that the corporation is not only influenced by the owners, but also that there is such unity of ownership and interest that their separateness has ceased; and (2) that the facts are such that treatment of the corporation as a separate entity would sanction a fraud or promote injustice.'" *Gillett v. Spirit Com. Auto Risk Retention Group*, No. 3:19-cv-260, 2020 WL 5732155, at *8 (W.D. Ky. Sept. 24, 2020), No. 3:19-cv-260, 2021 WL 27475 (W.D. Ky. Jan. 4, 2021) (quoting *Bear, Inc. v. Smith*, 303 S.W.3d 137, 147–48 (Ky. App. 2010)). WWWM concedes that if its relationship with Joel satisfies this two-part test, it loses. WWWM Response (DN 194-1) at 8.

***Separateness.*** "Courts have identified several factors bearing on this such as (1) whether the corporation is inadequately capitalized, (2) whether the owners observe corporate formalities, (3) whether the corporation issues stock or pays dividends, (4) whether it operates without a profit, (5) whether there is a commingling of corporate and personal assets, (6) whether the owners use corporate assets as their own, or in general deal with the corporation at arms length, (7) whether there are

5

non-functioning officers or directors, (8) whether the corporation is insolvent at the time of the transaction, (9) whether corporate records have been maintained, and (10) whether others pay or guarantee debts of the corporation. No single factor is dispositive." *Bear*, 303 S.W.3d at 148 (citation omitted).

Each of these factors either favors the Government or is neutral. First, WWWM is hardly capitalized at all. Its corporate representative testified that WWWM keeps "a few bucks" in its bank account to pay its monthly registration fees, but otherwise has no recurring financial activity. WWWM Depo. at 19:18–20. Indeed, the only WWWM transaction in the record is the cash infusion from iDOC that WWWM used to pay for the certificates of delinquency. Second, the record indicates that WWWM members do not observe corporate formalities. The membership records on file with the Commonwealth are inaccurate, the few files are kept in a "plastic bag," and the members neither meet nor hold votes. *See Bear*, 303 S.W.3d at 148 (alter-ego corporation "kept no shareholders' meetings or minutes of shareholders' meetings"). Third, WWWM issues no stock and pays no dividends. Fourth, it operates without a profit. *Id.* (corporation "admit[ted] that no dividends were paid to shareholders, and that no distributions were paid to shareholders"). The seventh element also favors the Government's position: WWWM has no directors, officers, or employees. Its roster consists of the nine members mentioned above, but those members are "non-functioning." *Id*. As discussed, they don't hold meetings, don't vote, and don't have any say in WWWM's day-to-day operations. As to the eighth factor, WWWM is essentially insolvent; the evidence demonstrates that it carries only a *de minimis* running balance. The ninth factor, corporate records, is neutral: yes, the outfit keeps its only records in a plastic bag or in a simple Excel spreadsheet—not exactly a robust corporate archive. But at least it does, in fact, keep some records! Finally, the tenth factor is neutral because the record doesn't indicate that WWWM carries any debt for another individual to guarantee.

Returning to the fifth and sixth factors, the evidence at least suggests that Joel and WWWM commingled personal and corporate assets and that Joel used WWWM assets as his own. The Government argues that because iDOC transfers cash into WWWM as needed, and because iDOC is Joel's company, Joel is really the one funding WWWM. MSJ Against WWWM at 10. While the iDOC-Joel-WWWM connection is certainly a close one, transfers between iDOC and WWWM are corporate-to-corporate transfers. That is, the Government hasn't shown that *iDOC* and Joel commingle assets, which is a necessary premise of its argument that the iDOC-WWWM transfers commingle Joel's assets with WWWM corporate assets. The proof arguably skips that step—or at least offers a relatively weak link in the chain. More probative, by contrast, is the (oral, not documentary) evidence that WWWM has paid the property taxes on Joel's Champion Lakes residence at least once. *See* Robinson Depo. (DN 192-6) at 37:2–7. While these fifth and sixth factors are each close to neutral, the overwhelming weight of the record evidence regarding the ten

"separateness" factors demonstrates—beyond the reasonable disagreement of any jury—that WWWM "is not only influenced by the owners, but [its] separateness" from Joel's interests "has ceased." *Gillett*, 2020 WL 5732155 at *8. Because no genuine issue of material fact remains on this point, the record supports summary judgment in favor of the Government.

***Fraud or Injustice.*** This second part of the alter-ego analysis asks whether "continued recognition of the corporation would sanction fraud or promote injustice." Courts consider whether: (1) "a party would be unjustly enriched," (2) "a parent corporation or individuals that caused a company's liabilities and its inability to pay for them would escape those liabilities," and (3) "an intentional scheme to squirrel assets into a liability-free corporation while heaping liabilities upon an asset-free corporation would be successful." *JPMorgan Chase, Nat. Ass'n v. Golden Ignot, LLP*, No. 3:14-cv-493, 2015 WL 94145, at *4 (W.D. Ky. Jan. 7, 2015) (cleaned up) (quoting *Inter-Tel Techs., Inc. v. Linn Station Properties, LLC*, 360 S.W.3d 152, 164 (Ky. 2012)). Each of those factors suggests that allowing WWWM to retain its interest in the certificates would promote fraud and injustice.

Allowing Joel himself to partially recover his tax debts—and further interfere with the Government's rightful recovery of those debts—by acting through WWWM would unjustly enrich him. Joel concededly owns a 10% stake in WWWM. MSJ Against WWWM at 4. That means, at a minimum, he would be entitled to 10% of the certificates' payoff after a foreclosure sale. Put differently, the proceeds of the Champion Lakes property intended to pay off *Joel's debts to the Government* would instead, partially, *flow to Joel himself*. This bears all the hallmarks of unjust enrichment: through WWWM, Joel (and his associates—see below) would receive a benefit at the expense of the Federal Government, which would otherwise recover the tax proceeds of a foreclosure sale. *See Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*, 540 S.W.3d 770, 777–78 (Ky. 2017). Whether the benefit is conceptualized as Joel remaining in the home, or Joel receiving tax proceeds obtained at a discount, the outcome would represent his unjust enrichment to the detriment of the public fisc.

That's not all. Joel would also benefit indirectly from the certificates' redemption. Each of the other members of WWWM bears an undisputed connection to Joel. As WWWM's corporate representative, Thomas Freedman manages WWWM's funding relationship with iDOC, Joel's company. Freedman Depo. (DN 192-3) at 13:9–24, 36:2–6, 37:14–23. Cody T. Joel is Larry Joel's son. *See* Joel's Motion to Vacate/Stay (DN 187-1) at 9. Michael Ching Chao Chang is one of Joel's Chinese "contacts that Dr. Joel knows to help … with Chinese investors." WWWM Depo. at 46:14–17. Felicia Chang "got involved" in WWWM because she is Michael's wife. *Id.* at 46:10–11. iDOC Shanghai is the now-defunct Chinese affiliate of Joel's

company iDOC. *Id.* at 43:20–44:4 (explaining that WWWM hasn't "talked to" iDOC Shanghai since around "2018 … before the pandemic"). Finally, OM Partners is registered to the same address as iDOC and WWWM. *See* WWWM K-1 (DN 192-5) at 15. In sum, these connections constitute circumstantial but unrebutted evidence that Joel and his associates would receive unjust enrichment if WWWM is paid on its certificates.[2] *See, e.g.*, *Randle v. Allstate Indemnity Co.*, 649 F. Supp. 2d 675, 678 (N.D. Ohio 2009) ("Circumstantial evidence … may serve as a basis for summary judgment.").

The second and third factors—escaping liabilities and squirreling away assets—also favor the Government.

In Joel's criminal case, he pled guilty to hiding "his ownership of and control over a number of assets" by using "sham trusts; nominee corporations; nominee bank accounts; and other alter ego names." Plea Agreement at 2. Similarly, this Court has already found that one corporate entity, C.T.J. Trust, was a sham; it merely held the Champion Lakes property in constructive trust for Joel himself. *See generally* MSJ Hearing Tr. at 18:10–13. This legalistic legerdemain suggests that Joel's maneuvers were no "accident," but rather indicated an "intent" and "motive" to escape his tax debts. *See* FED. R. EVID. 404(b)(2).

Direct evidence of his intent points in the same direction. Douglas Weaver, the attorney and accountant who incorporated WWWM, testified that Joel specifically "asked if there was any mechanism by which foreclosure of the trust property could be avoided." Weaver Affidavit ¶ 6. Weaver responded that Joel should purchase the certificates of delinquency through WWWM. *Id.* The whole point was to shield the Champion Lakes property from foreclosure through financial chicanery. Nothing suggests Joel and the other WWWM members had some innocent reason to invest in Kentucky tax-debt receivables tied to their friend's long-running IRS standoff.

The timing of the iDOC-WWWM transaction also stinks. Shortly after WWWM was incorporated, Joel's company iDOC transferred $300,000 to WWWM,

---

[2] Neither side introduced any record evidence regarding the final two members. The Government asserts, without citation, that Apryl Robinson is Joel's girlfriend. MSJ Against WWWM at 4. Likewise, it asserts that AP Partners is registered to the same address as Joel's daughter. *Compare* Property Records (DN 192-4) at 1 (showing address for "Allison R P Peterson" in Minnetonka, Minn.), *with* WWWM K-1 (DN 192-5) at 5 (showing same address for AP Partners). No affirmative evidence in the record confirms that "Apryl Robinson" is Joel's girlfriend or that "Allison R P Peterson" is Joel's daughter—though WWWM hasn't disputed either assertion. But for purposes of this motion, the Court disregards them as unsupported. *See* FED. R. CIV. P. 56(c)(1)(A) (requiring a party seeking summary judgment to cite "particular parts of materials in the record" to support an undisputed fact).

presumably at Joel's direction; he, after all, is the one who makes the "strategic decisions" for the firm. WWWM Depo. at 55:24–56:5. Less than a month later, WWWM bought iDOC for a mere thousand dollars, despite the "forty years and millions of dollars" iDOC had allegedly spent developing its products. DN 119 at 3; Weaver Affidavit ¶ 4. Then, only *after* the Jefferson Circuit Court entered an order of sale on Joel's Champion Lakes property did WWWM purchase the certificates of delinquency. WWWM Depo. at 64:13–14. And it did so in response to Joel's explicit desire to avoid foreclosure. *Id.*; *see* Weaver Affidavit ¶ 6.

In sum, the record evidence allows no reasonable conclusion other than that WWWM purchased the rights to Joel's unpaid tax debts as a front for Joel himself. Any separateness between the two entities disappeared, at least in the eyes of Kentucky corporate law, when Joel used WWWM to serve his personal interests in tax avoidance. Given this, allowing WWWM to retain its certificates of delinquency would promote fraud and injustice: Joel and his confederates would receive sale proceeds that ought to satisfy Joel's delinquent tax debts to the IRS.

Nothing in WWWM's counterarguments changes that conclusion. It has pointed to practically no material in the record that would create a triable fact regarding corporate separation. This omission is all the more notable after the Court's admonition to "cit[e] particular parts of materials in the record" that WWWM believed would signify a genuine dispute of material fact—and even more so considering that admonition came *after* the first round of briefing and a hearing. DN 204 (quoting FED. R. CIV. P. 56(c)(1)(A)). WWWM's supplemental response, like its original response, *see* DN 194-1, relies primarily on testimony from Freedman, its corporate representative, regarding "the formation of" WWWM. WWWM Supplemental Response (DN 208) at 2. As Freedman explains, WWWM was initially set up to be a holding company for "iDOC's intended investment companies." Freedman Depo. (DN 208-13) at 23:2–12; *see also* Weaver Affidavit ¶ 3 (explaining that WWWM was initially set up as "a family entity … to function as a holding company for companies such as [iDOC]"). But because of "the trade war with China and the Trump tariffs," its business plans changed "[d]ramatically" and the planned investments didn't pan out. *Id.* at 29:21–30:5; *see also* Weaver Affidavit ¶ 5 (explaining that "political decisions and/or high tariffs have slowed, if not halted, iDOC's efforts to develop profitable ventures in China, Poland, and other countries in the European Union"). Even assuming entirely benign plans stymied by geopolitics beyond the reach of Champion Lakes, WWWM never explains why that would prevent Joel from later using it as a vehicle to escape his tax liabilities. This origin story is almost entirely beside the point: when WWWM bought Joel's delinquency certificates using money Joel routed through Joel's company, nothing from Freedman

9

or Weaver suggests WWWM operated separately from—rather than specifically for—Joel. Nor does WWWM dispute that, as of now, its operations are stagnant.

WWWM's few remaining responses likewise fail to rebut the record evidence. WWWM attempts to explain away its lack of functioning officers and directors by claiming that it is "member-managed." WWWM Response at 9. But that unsupported assertion contradicts the evidence that only Joel had signature authority for WWWM, only Joel and Weaver participated in the decision to purchase the certificates of delinquency, and WWWM's corporate representative couldn't recite even basic details about the members. WWWM Depo. at 33:22–24, 41:8–48:1; Weaver Affidavit ¶ 6. Similarly, WWWM's only argument for solvency relies on the iDOC transaction. WWWM Response at 9. That doesn't help: as explained above, the record indicates that transaction occurred to help Joel evade foreclosure. *Id.* Finally, the numerous new exhibits WWWM filed only *after* the Court's post-hearing prompt (DN 204) to supplement the record primarily show and discuss iDOC's operations. *See, e.g.*, DNs 208-1, 208-3, 208-4, 208-5, 208-8, 208-10, 208-11, 208-12. But that evidence is scarcely relevant to *Joel's* relationship with *WWWM*. Nothing in the record, therefore, would give a jury a reasonable basis to conclude that Joel and WWWM were in fact separate entities.

Given this lack of a genuine dispute of material fact regarding Joel's relationship with WWWM, the United States is entitled to summary judgment against WWWM.

### III.  Summary Judgment Against Joel

Having cleared the docket of all others with an interest in the Champion Lakes property, the United States finally seeks summary judgment against Joel himself.

#### A. Joel's Tax Debts

Joel underreported his federal tax liabilities for three years in the early 1990s, as discussed above and established in his criminal prosecution. To recover these unpaid amounts, the United States filed several federal tax liens against Joel personally (DNs 193-2, 193-4) and against C.T.J. Trust (DN 193-3). Those liens attached to the Champion Lakes house. The Court has already determined that C.T.J. Trust held that property in constructive trust for Joel. After more than a decade of litigation, no other individual or corporate entity claims an interest in the property. *See* DNs 166, 191, 204 (orders extinguishing property interests). The United States thus seeks to reduce to judgment its liens on the Champion Lakes property, clearing the path for foreclosure and a judicial order of sale.

## B. Summary Judgment

Federal law provides that if a taxpayer "refuses to pay" his taxes, a "lien in favor of the United States" arises "upon all property and rights to property, whether real or personal," belonging to the taxpayer. *See* 26 U.S.C. § 6321. Such liens arise by pure operation of law "at the time the assessment is made." § 6322. The sweeping phrase "all property and rights to property … reveals on its face that Congress meant to reach every interest in property a taxpayer might have." *United States v. National Bank of Commerce*, 472 U.S. 713, 719–20 (1985) (citation omitted). That includes not only property held by an individual, but also property held by a third party if "the third party is holding the property as a nominee or alter ego of the delinquent taxpayer." *Spotts v. United States*, 429 F.3d 248, 251 (6th Cir. 2005) (citing *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350–51 (1977)).

When the United States identifies a delinquent taxpayer's property, it may file a civil action "to enforce the lien." 26 U.S.C. § 7403(a). The court must then "finally determine the merits of all claims to and liens upon the property." § 7403(c). Then, the court "may decree a sale of such property … and a distribution of the proceeds of such sale according to the findings of the court in respect to the interests of the parties and of the United States."[3] *Id.*

---

[3] Joel belatedly and incorrectly contends that his son Cody is such a party whose interests must be adjudicated before any foreclosure. Cody, who hasn't appeared in this litigation, apparently lives in the house on Champion Lakes with his father. But under § 7403, as interpreted by the Supreme Court in *United States v. Rodgers*, this judicial sale wouldn't create the "possibility that innocent third parties will be unduly harmed" such that the Court should delay a sale. 461 U.S. 677, 709 (1983). The *Rodgers* four-factor balancing test instructs courts to balance the government's interest in collecting taxes against the harm a sale might cause innocent third parties. But that balancing test is required only after a finding of undue third-party hardship, which hasn't occurred (or even been requested) here. As the Sixth Circuit has noted, courts need not apply

> the four-factor balancing test before … order[ing] a sale under § 7403. To the contrary, the *Rodgers* Court established the balancing test as a requirement only *after* the district court first determines that a § 7403 sale would cause undue hardship to an innocent third-party; before exercising its limited discretion *not* to order the sale, a district court must justify that decision by means of the *Rodgers* balancing test.

*United States v. Barr*, 617 F.3d 370, 375–76 (6th Cir. 2010) (emphasis added).

The only conceivably "innocent" third party who might be harmed by a judicial sale of the Champion Lakes property is Cody Joel. But as the Court has made clear for months, Cody has been free to assert his interest throughout this litigation. *See, e.g.*, Motion to Vacate Hearing Tr. (DN 205) at 11:13–18 (The Court: "I'll say again, if Cody wants to make a claim

11

The United States has complied with this statutory framework. It has indisputably demonstrated that Joel is delinquent on his federal taxes, that federal tax liens are attached to Joel's interest in the Champion Lakes property, and that federal law authorizes this civil foreclosure suit. And the Court has now determined "the merits of all claims to and liens upon the property," *see* 26 U.S.C. § 7403(c), leaving none intact but Joel's. The United States is thus entitled to summary judgment against Joel.

Joel's counterargument is equal parts confused and wrong. When the United States first sought summary judgment against Joel, he didn't respond for months. DN 193. So the Court ordered him to respond. DN 196. After granting him an extension, Joel's "response" simply adopted WWWM's response as his own. DN 200. This was a curious course to chart, as the factual and legal questions facing WWWM (whether it's Joel's alter ego) and Joel (whether the USA can foreclose on his house) are quite different. Nonetheless, the Court held a hearing on the United States' motions. DN 204. After the hearing, the Court gave Joel additional time to file yet another response. *Id*. After multiple extensions, Joel finally filed his own response—three months and a day after the United States filed its motion. DN 211.

After that extensive windup, one might expect a well-aimed pitch for why summary judgment is inappropriate. Alas, no. Joel's response attempts to relitigate the Court's previous decision that C.T.J. Trust held the Champion Lakes property in constructive trust for Joel himself. *Id*. at 1–3. It cites Judge McKinley's 2018 summary-judgment order denying an earlier motion from the United States. But a lot has happened since then. The United States has conducted additional discovery and submitted additional evidence into the record; indeed, part of the reason Judge McKinley denied summary judgment was because the "United States indicate[d] that it has not received the discovery requested from the Defendants." Order (DN 78) at 20. The additional evidence and litigation render Judge McKinley's order no shield to summary judgment today. No "law of the case" was established by Judge McKinley's interlocutory 2018 opinion ruling that the Government hadn't carried its burden on summary judgment. *Contra* WWWM Response at 14. As experienced defense counsel surely understands, Rule 56(b) contemplates that parties may move

---

or an appearance, then Cody Joel is free to do so. He has not, despite long, long-running litigation, and no one has articulated to me a reason why we should not proceed with the summary judgment … motions based on his absence."). His failure to do so makes it hard to see how he'd be unduly prejudiced by a potential foreclosure that he's known about for years. So the Court declines to exercise its discretion not to order a judicial sale based on potential harm to Cody—potential harm, it's worth noting, that the Defendants haven't briefed.

for summary judgment more than once—"at any time," unless "a different time is set by local rule or … court orde[r]."

The remainder of Joel's response returns to the plea that Cody Joel is an indispensable party. Response at 3. But the Court has already squarely held that Cody is not, in fact, indispensable. Motion to Vacate Hearing Tr. (DN 205) at 9:19–21 ("I'm going to deny the motion to stay and deny the argument that Cody Joel is a necessary party …."). Joel offers no explanation for why the parties may or should relitigate that issue now.[4]

## ORDER

Because WWWM bought the certificates of delinquency as Joel's alter ego, and because federal law authorizes the United States to foreclose on Joel's Champion Lakes property to satisfy his unpaid taxes, the Court grants both of the United States' summary-judgment motions. A separate final judgment will follow. *See* FED. R. CIV. P. 58. The United States should file, within 30 days of entry of judgment, any additional motions necessary to facilitate the sale of the Champion Lakes property.

---

[4] Joel's response attaches an affidavit from Douglas Weaver. DN 211-1. But the response cites it only in a footnote and without any pinpoint citation. The affidavit, moreover, is unsigned. *See id.* at 5. That's reason enough to ignore it: "affidavits must be signed and properly attested to be cognizable under Rule 56." *Sfakianos v. Shelby County Gov't*, 481 F. App'x 244, 245 (6th Cir. 2012) (citation omitted). This Court has previously considered a signed and otherwise identical copy of this affidavit, however. *See* DN 187-2, Exh. 11 at 65–69. Regardless, as the United States accurately points out, Weaver's affidavit consists almost entirely of legal conclusions, DN 211-1 ¶ 12 ("I believe, based upon my review of the many documents and conversations with Larry Joel, and Greg Yopp, that the CTJ Trust was a legally formed trust at its inception."); opinion testimony, ¶ 9 ("I see nothing inherently wrong with this transaction that could be construed as converting the valid CTJ Trust into a 'sham trust.'"); and hearsay, ¶ 10 ("Mr. Joel repeatedly told me …."), none of which Joel could properly admit under the Federal Rules of Evidence. *See* U.S. Reply (DN 213) at 5–9. And in any event, the majority of Weaver's testimony bears on whether the C.T.J. Trust was a "sham trust," an issue the Court has already addressed.